NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**GIAN DURI,**
*Petitioner*

**v.**

**DEPARTMENT OF THE NAVY,**
*Respondent*

_____

2023-2246

_____

Petition for review of the Merit Systems Protection Board in No. SF-0432-22-0438-I-1.

_____

Decided: January 16, 2025

_____

GIAN CARLO DURI, Pacific Grove, CA, pro se.

DELISA SANCHEZ, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent. Also represented by BRIAN M. BOYNTON, ALBERT S. IAROSSI, PATRICIA M. MCCARTHY.

_____

Before DYK, PROST, and CUNNINGHAM, *Circuit Judges*.

PER CURIAM.

Gian C. Duri has petitioned for review of the Merit Systems Protection Board's ("MSPB") decision affirming the Department of the Navy's ("agency") performance-based removal of Mr. Duri. *Duri v. Dep't of the Navy*, No. SF-0432-22-0438-I-1, 2023 WL 3440813 (M.S.P.B. May 8, 2023) ("*Decision*"). For the following reasons, we affirm.

## BACKGROUND

Mr. Duri was a General Engineer, GS-0801-11, at the Naval Postgraduate School ("NPS") in Monterey, California. A GS-0801-11 General Engineer at NPS "serve[s] as staff advisor to the NPS Director of Facilities on problems of facilities management" and "is concerned with the planning, analysis, and improvement of integrated facility control systems." ECF No. 56-41 at 3. In the 2016 rating year, Mr. Duri received an "acceptable" rating on his annual performance plan and comments related to areas of needed improvement. In the 2017 midyear-progress review, Mr. Duri's rater expressed concerns about Mr. Duri's work quality, time spent away, and time spent conducting personal business at work. Later, Mr. Duri's rater moved to a different position, leaving a supervisor vacancy; and in July 2017, Mr. Duri's position was realigned to provide him with a facilities-management supervisor. The new supervisor completed Mr. Duri's annual assessment on November 6, 2017, and rated his overall performance as unacceptable. *Decision*, 2023 WL 3440813.

Mr. Duri disputed his 2017 rating and requested to be transferred. After continued conversations and disputes between Mr. Duri and his supervisor regarding Mr. Duri's assignments and unacceptable work performance, Mr. Duri was given a Notification of Unacceptable Performance and Opportunity to Improve Plan ("PIP") on April 13, 2018. Sixty days from issuance, the PIP required Mr. Duri to complete Access database training courses;

"produce an acceptable checklist to be used during . . . inspections"; produce an Access database that is "up and running" with incorporated checklists; conduct "40 completed inspections per week"; and "keep [the Director] and the Deputy Facilities Manager apprised of any issues . . . identified and the corrective actions . . . to take." ECF No. 56-11 at 1–4 (PIP).[1] After the PIP period, the supervisor decided that Mr. Duri's performance warranted removal from federal service because he had failed to (a) correctly use the checklists to conduct inventories and complete the 40 inspections per week; (b) complete additional Access training; (c) appropriately format the inspection database; (d) properly utilize and input data into an Access database; and (e) take action to resolve identified discrepancies. ECF No. 56-6 at 1–3 (Proposed Removal from Federal Service). After a dispute before the Equal Employment Opportunity Commission, Mr. Duri filed an appeal to the MSPB challenging the Office of Personnel Management's approval of the agency's performance appraisal system, the communication and validity of performance standards, whether there was a reasonable opportunity to improve, and whether the agency discriminated and retaliated against him. Though untimely, the MSPB administrative judge ("AJ") found that good cause existed and referred the appeal to the Mediation Appeals Program ("MAP"). The mediator released the appeal from MAP without a settlement, and Mr. Duri withdrew his request for a hearing. Based on the written submissions, the AJ affirmed the agency's removal action.

---

[1] The parties dispute which day the PIP began. ECF 53-2 at 20 ("Actually, the PIP started on April 18 . . . ."); *id.* at 24 ("But the PIP started on Monday, 16 April . . . ."); ECF 42-1 at 7 ("The PIP started on April 15, 2018 . . . .").

Because Mr. Duri did not petition for review with the MSPB, the AJ's decision became final on June 12, 2023.

Mr. Duri timely petitioned for review, and this court has jurisdiction under 28 U.S.C. § 1295(a)(9).

## DISCUSSION

In review of MSPB final decisions, we are required to affirm the decision unless "any agency action, findings, or conclusions [are] found to be—(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). "The petitioner bears the burden of establishing error in the [MSPB]'s decision." *Harris v. Dep't of Veterans Affs.*, 142 F.3d 1463, 1467 (Fed. Cir. 1998).

Mr. Duri argues that he should not have been terminated because (1) the agency did not measure his work as of PIP day 60 and proposed his removal before training occurred; (2) the AJ dismissed evidence; and (3) Mr. Duri's performance plan's critical element was unachievable. We disagree and address each of Mr. Duri's arguments in turn.

## I

We first address Mr. Duri's argument that the agency removed him without considering his work as of PIP day 60. Specifically, Mr. Duri argues that the agency was required to wait 60 days after issuing the PIP before re-measuring his work and making a termination decision. The AJ found that the "PIP was issued on April 13, 2018, and scheduled for 60 days. It began on April 15, 2018, and ended on June 13, 2018." *Decision*, 2023 WL 3440813. Mr. Duri, however, contends that the PIP started on April 16, 2018, or alternatively, should have begun April 18, 2018. ECF 53-2 at 20, 24.

Even assuming that the PIP started on April 16 or 18, 2018, and ended on June 14 or 16, 2018, Mr. Duri has not shown that he completed all of his required PIP objectives by June 16. Indeed, he admits he did not complete the required training program prescribed in the PIP. Specifically, Mr. Duri concedes that "my failing to learn Access on my own was one of the major justifications for initiating the PIP and for proposing I be removed from NPS employment. That was also one of the major reasons the President agreed to remove me from employment." *Id.* at 15–16.

While Mr. Duri attempts to transform this failure to complete the required training into an MSPB error, we disagree the MSPB erred. *See id.* at 11 (alleging the AJ "erroneously claimed [that Mr. Duri] should have looked for outside training sources" but that Mr. Duri was not asked or funded to do so). The AJ found that the "performance plan told [Mr. Duri] what he needed to be trained in and when to complete it." *Decision*, 2023 WL 3440813. Mr. Duri's performance plan "included instructions to procure training," and "there was nothing improper with including training as part of the performance plan." *Id.* The AJ found that Mr. Duri's supervisor "adhered to the policy by assessing the training needs, giving information to [Mr. Duri], and directing him to arrange the details in a manner that worked for him." *Id.* And given that Mr. Duri was a GS-11 professional, he "could reasonably be expected to find and complete the exact course or courses to increase his proficiency." *Id.* The AJ also found that "there was a significant amount of training available. Training in Access was available to NPS employees in 2018 through both online computer courses and outside contractors. Online courses would have been sufficient to learn enough to create simple or moderately complex databases." *Id.* (cleaned up).

Accordingly, the AJ found (and Mr. Duri admits) that he did not complete the training as required by the PIP,

whether by June 13, 14, or 16, 2018; and substantial evidence supports the AJ's findings that Mr. Duri did not meet these PIP requirements.

## II

We now turn to Mr. Duri's argument that the AJ dismissed some evidence during discovery. Specifically, Mr. Duri alleges that "[t]he [a]gency failed to provide the two binders" which contained his work. ECF 53-2 at 20–21. But Mr. Duri does not argue or demonstrate how such evidence would overcome the AJ's factual determinations. *See Harris*, 142 F.3d at 1467 ("The petitioner bears the burden of establishing error in the [MSPB]'s decision."). Additionally, the AJ reviewed "in its entirety" a voluminous record including nearly 5000 pages.[2] *Decision*, 2023 WL 3440813, n.1. Without explanation of why these two binders would overcome the evidence on record, we conclude that substantial evidence supports the AJ's factual findings.

## III

Finally, Mr. Duri argues that his performance plan's critical element was "ambiguous, ambitious, and unachievable." ECF 53-1 at 2; *see also* ECF 53-2 at 10 ("My supervisor had established unachievable deadlines."); *id.* at 15; *id.* at 18. In Mr. Duri's view, his "supervisor failed to

---

[2] The AJ found the appeal file "voluminous, including, by [his] calculations, an agency file of 1792 pages, agency close of record submissions of 987 pages, and appellant close of record submissions of 2034 pages. Despite the volume, the record is highly redundant. [The AJ] ha[s] reviewed the record in its entirety." *Decision*, 2023 WL 3440813, n.1 (citations omitted).

revise the unachievable . . . initial deadlines and failed [Mr. Duri] for missing those deadlines." ECF 53-1 at 2.

"[E]ach [agency] performance appraisal system shall provide for—(1) establishing performance standards which will . . . permit the accurate evaluation of job performance on the basis of objective criteria"; (2) "communicating to each employee the performance standards and the critical elements of the employee's position; (3) evaluating each employee during the appraisal period on such standards;" (4) "rewarding employees whose performance so warrants; (5) assisting employees in improving unacceptable performance; and (6) reassigning, reducing in grade, or removing employees who continue to have unacceptable performance but only after an opportunity to demonstrate acceptable performance." 5 U.S.C. § 4302(c).

Here, the AJ disagreed with Mr. Duri's arguments and found that the critical element of conducting "space inventories is consistent with the appellant's position description. The position description provides that 40% of the incumbent's duties involve providing information to management to make decisions on facilities allocations, including executing 'a detailed process for auditing space utilization across campus' and conducting 'space inventories of the academic facilities,'" with "[a]nother 40% of the job involving investigating and evaluating space allocation factors." *Decision*, 2023 WL 3440813 (cleaned up) (citing ECF No. 56-41 at 4). On the evidence of record, the AJ found that the alleged ambiguity claimed by Mr. Duri was persistent disagreement with the standards of his supervisor's instructions. "In context[,] it was sufficiently clear what an inspection was, what a space was, and what a database was," and the AJ concluded that "the standards were sufficiently objective." *Id.* Furthermore, the AJ found that "the standards established in the PIP were realistic and attainable." *Id.* Based on Mr. Duri's experience and his supervisor's testimony, Mr. Duri "should have been able to develop a checklist in eight

hours, create a schedule in one hour, and do 10–20 inspections per day." *Id.* Therefore, it would have been "very reasonable" to complete 40 inspections per week, given the duration of a single inspection to not take more than 10–15 minutes. *Id.* Again, substantial evidence supports the AJ's findings.

## CONCLUSION

We have considered Mr. Duri's remaining arguments and find them unpersuasive. For the foregoing reasons, we affirm.

## **AFFIRMED**

### COSTS

No costs.